[Cite as *Peterson v. Securitas Security Serv.*, 2021-Ohio-3254.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MICHELLE PETERSON | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29094 |
| | : | |
| v. | : | Trial Court Case No. 2020-CV-2903 |
| | : | |
| SECURITAS SECURITY SERVICE, et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Defendants-Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of September, 2021.

. . . . . . . . . . .

MICHELLE PETERSON, 254 Glenside Court, Trotwood, Ohio 45426
        Plaintiff-Appellant, Pro Se

ROBIN JARVIS, Atty. Reg. No. 0069752, 1600 Carew Tower, 441 Vine Street, Cincinnati, Ohio 45202
        Attorney for Defendant-Appellee, Director, Ohio Department of Job and Family Services

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Michelle Peterson, appeals pro se from the trial court's order finding that she was discharged from her employment for just cause. In so finding, the court upheld the decision of the Unemployment Compensation Review Commission ("UCRC"), which had found that Peterson was not entitled to unemployment benefits.

{¶ 2} Peterson's pro se brief contains three issues for review, but does not assign specific error, other than making some fairly indecipherable statements about why she was improperly terminated. As a result, for purposes of review, we will consider the proposed assignment of error that Appellee, Director of the Ohio Department of Jobs and Family Services ("ODJFS"), has asserted. According to ODJFS, the issue is whether the trial court erred when it affirmed the UCRC's finding that Peterson was discharged for just cause.

{¶ 3} After reviewing the record, we agree with the trial court that the UCRC's decision that Peterson was discharged for just cause was supported by the record. The record indicates that Peterson failed to appear for work and was discharged in accordance with company policy. Accordingly, the trial court's judgment will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} On July 27, 2020, Peterson filed a notice of administrative appeal in the trial court. The appeal was from a July 22, 2020 UCRC decision, which found that Peterson had been discharged for just cause from her employment with Securitas Security Service ("Securitas").[1] The ODJFS Director was named in the suit, and filed both a notice of

---

[1] Securitas did not appear in the trial court and also has not filed a brief with our court.

appearance and a request for an extension of time to file the administrative transcript.

{¶ 5} The extension was granted, and ODJFS filed a certified transcript on September 17, 2020. The trial court then set a briefing schedule, and all parties filed briefs and reply briefs consistent with the schedule. After considering the record, the court issued a decision on March 12, 2021, upholding UCRC's decision as "lawful, reasonable, and not against the manifest weight of the evidence." Order (March 12, 2021), p. 5.

{¶ 6} The certified administrative transcript contains two items: a copy of the Director file, and a copy of the Unemployment Compensation Commission File (designated respectively as "A" and "B"). According to this record, Peterson filed an application for unemployment benefits on December 23, 2019. Ex. A (Application Summary). On January 13, 2020, ODJFS allowed Peterson's claim, effective December 16, 2019, with a weekly benefit amount of $261. The stated reason was that beginning on that date, Peterson had been "either partially or totally unemployed due to a lack of work/layoff" from Securitas. Ex. A (Determination of Unemployment Compensation Benefits, p. 1). On February 3, 2020, Securitas appealed the decision, alleging that Peterson was considered to have voluntarily quit because she failed to call or report for work for three days of unreported absences.

{¶ 7} In response, Peterson claimed she was told several times that she was fired, and that she did not report for work because no supervisor called to check on why she did not show up for work. Ex. A (February 6, 2020 Peterson Letter). During both the determination and redetermination process, Peterson also faxed a series of documents to ODJFS. *See* Ex. A (January 2, 2020 Peterson Fax, p. 1-13) and (February 7, 2020

Peterson Fax, p. 1-15).

{¶ 8} The documents Peterson faxed included: (1) a December 20, 2019 email from Peterson to Tina Jackson (a Securitas human resource ("HR") specialist), and an incident report that was attached to the email; (2) a July 21 (unspecified year) email from Peterson to Jackson, asking to be transferred to a desk, hospital, or processing job; (3) Peterson's December 18, 2019 discharge instructions from Urgent Care; (4) two December 13, 2019 emails concerning a trailer incident that occurred on December 12, 2019, during which an outbound driver was allowed to leave with a loaded trailer when he was only supposed to leave with an empty trailer; (5) two counseling and corrective actions reports (dated October 25, 2019, and November 11, 2019), which were both based on Peterson's being late for work numerous times; (6) a December 14, 2019 final counseling action and corrective report, which was based on Peterson's failure to inform her supervisor that a truck left the facility and did not stop; and (7) an October 22, 2019 counseling and correction action report, based on Peterson's abusive and threatening behavior toward a driver.

{¶ 9} On February 25, 2020, the Director filed a redetermination, allowing Peterson's claim and modifying the original decision to find that Peterson was discharged without just cause. *See* Ex. A (Director's Redetermination), p. 1.

{¶ 10} On March 17, 2020, Securitas again appealed, contending that Peterson was determined to have voluntarily quit. The file was then transferred to the UCRC. After UCRC provided the parties with notice of a hearing date, counsel entered an appearance for Peterson. During the hearing that took place on March 31, 2020, the hearing officer heard testimony from Tina Jackson, the human resources specialist, and

from Peterson.

## A.   Tina Jackson's Testimony

{¶ 11} According to Jackson's testimony, Securitas employed Peterson as a security officer between February 15, 2018, and December 28, 2019.   Ex. B (March 31, 2020 Hearing Transcript ("Tr. 1"), p. 6).    Mitch Murray, a site supervisor, was Peterson's immediate supervisor.   *Id.* at p. 6-7.   Peterson worked at only one site, Proctor and Gamble ("P&G").   *Id.* at p. 7.

{¶ 12} Jackson testified that if Peterson planned to be absent from work, she was required to call Murray, and if she was unable to contact Murray, she should call Todd Harper, the Securitas district manager.   *Id.* at p. 7.   On December 16, 17, and 18, 2019, Peterson called off work, and Securitas was aware that she would not be at work on those days.   *Id.* at p. 8.   Peterson was not on medical leave at the time.   *Id.* at p. 7-8.

{¶ 13} On December 24, 25, and 26, 2019, Peterson was scheduled to work. However, Peterson was a "no-call, no-show" on those dates.   *Id.* at p. 7.   Securitas's company policy was that when an employee had three days of no-call, no-show, it was counted as a resignation of the employee's position.   *Id.* at p. 8.   The company policy was contained in a handbook that Peterson would have received on February 15, 2018, and she would also have received a revised and updated handbook on November 15, 2019.   *Id.* at p. 9-10.

{¶ 14} When a three-day no-call, no-show situation occurred, Securitas sent a letter to the employee, indicating that the employee was considered to have resigned. Securitas sent such a letter to Peterson, by certified mail, on December 30, 2019, and

received a receipt that the mail had been delivered. The letter referenced page 102 of the handbook, which stated that "Failure to show up or call for three or more consecutive days may be considered an automatic resignation." Ex. B (December 30, 2019 letter to Michelle Peterson, p. 1).

{¶ 15} There were no other reasons for the discharge. Tr. 1 at p. 9. Peterson did not respond to the letter. *Id.* If Peterson had any issues with the letter, she could have contacted Jackson, who had an "open-door" policy. *Id.* at p. 9-10.

## B. Peterson's Testimony

{¶ 16} Peterson's testimony at the hearing was difficult to understand because she did not respond directly to questions, rambled, and did not provide precise dates for matters she discussed. At the hearing, Peterson gave the following explanation of her actions.

{¶ 17} At the time of the events in question, Peterson worked third shift, from midnight to 8:00 a.m. Tr. 1 at p. 18. The last day that Peterson worked began at midnight and ended around 8:45 a.m. on December 16, 2019. *Id.* Peterson was also scheduled to work the night of December 17, with her shift beginning at midnight and ending at 8:00 a.m. *Id.*

{¶ 18} On the morning of December 16, Peterson's supervisor, Mitch Murray, asked her to come to his office to talk about an incident that had previously occurred at work. *Id.* at p. 14. Peterson told Murray that she needed to go home because her water heater was out, but Murray said he needed to see her then. As a result, she went to Murray's office, where he kept her for about 45 minutes after her normal departure time,

or until around 8:45 a.m.   *Id.* at p. 14 and 18.

{¶ 19} According to Peterson, she had been given a written correction notice about an incident that occurred in "Outbound," when she let a truck go through without stopping it.   However, Peterson claimed that she was not the culprit, that she had been switched that day from Outbound (apparently from checking outbound trucks to checking inbound trucks), and that she was not there when the incident happened.   *Id.* at p. 14 and 17. Another employee in Outbound was also at the meeting; after Murray talked to them both, he kept Peterson longer.   Peterson then signed the counseling documentation.   *Id.* at p. 16-17, and 18.

{¶ 20} On December 16, 2019, Peterson also wrote up a form documenting an incident that had occurred that day with a driver who was very rude and aggressive with her.   *Id.* at p. 18 and 24.   Peterson also talked with Todd Harper, the district manager, about the incident, and he told her to write up an incident report.   *Id.* at p. 25-26. Peterson told Harper that she had already written up a report.   *Id.* at p. 26.

{¶ 21} Again, according to Peterson, she told her supervisor, Murray, that she would not be able to come in for her shift that was scheduled later that day, i.e., that was to start at midnight on December 17.   Peterson's reason was that people would be at her apartment to fix her water heater at around 2:00 or 3:00 p.m., and she would not get enough rest to do her job properly.   *Id.* at p. 18-19.   However, Murray told her that if she did not show up for her shift, she would be fired.   *Id.* at p. 17 and 18-19.   Peterson did not go in for her shift that evening.   *Id.* at p. 19.

{¶ 22} Peterson agreed that she had signed the counseling and corrective action report about the Outbound incident on December 16, 2019.   She further agreed that the

report was a final warning and that it did not say she was being terminated. However, she claimed she had been told verbally by both Murray and Harper that she was being fired. *Id.* at p. 26-27 and 29. According to Peterson, Harper fired her on December 16, 2019, because he was upset that she had called two individuals above him in the chain of command to complain about the incident with the truck driver who had been aggressive. *Id.* at p. 19-20.

{¶ 23} Peterson also stated that she had called in sick on December 17, 2019, and then went to an urgent care on December 18, 2019. On December 20, 2019, Peterson sent Tina Jackson an email and included another incident report she had written about the driver who had been aggressive. *Id.* at p. 27. The email stated that Peterson had tried to reach out to Jackson the day before (December 19) and had been ill for a couple of days. According to Peterson, she was not contacting Jackson to call off work; she was emailing Jackson because she had been told to send in an incident report about the driver. *Id.* at p. 29.[2] Peterson did not tell Jackson in the email that she had been fired. *Id.* at p. 30.

{¶ 24} In the incident report attached to the email, Peterson said that she had told her supervisor about a December 4, 2019 incident with a truck driver, Jeff, who did not obey her instructions and was hostile to her. Ex. A (February 7, 2020 Peterson Fax, at p. 5-6). Peterson also said she had called Mitch Murray on December 16, 2019, about another incident that occurred with Jeff at 6:30 a.m. that day; however, Murray was concerned instead with her signing a write-up that she had gotten. *Id.* at p. 5.

{¶ 25} In addition, Peterson's incident report discussed the fact that she had

---

[2] This is the same incident for which Peterson had already provided an incident report.

contacted persons in the chain of command above Harper to discuss the incidents with Jeff, and that Harper had called her about it. During this conversation, Harper shouted at Peterson and told her that she did not work for these other individuals and should report to him. *Id.* at p. 6. In this letter, sent to Jackson on December 20, 2020, Peterson did not claim that either Murray or Harper had previously fired her.

{¶ 26} Because witnesses had not received subpoenas and the time for the hearing that day had elapsed, the hearing officer set a second hearing for April 22, 2020. On that day, Securitas presented testimony from Murray, Harper, and Jackson, and Peterson presented testimony from her daughter, Raven Peterson.

### C. Raven Peterson's Testimony

{¶ 27} Raven stated that she heard a call that occurred when Peterson was on the phone speaking to one of her supervisors. Raven could not recall the exact day this occurred, but the call was on a speaker and she could hear it. Ex. B (April 22, 2020 Hearing Transcript ("Tr. 2"), p. 8). The speaker was very belligerent, used a curse word, and told Peterson that she was fired. He did not give an exact reason. *Id.* at p. 9.

### D. Mitch Murray Testimony

{¶ 28} Murray stated that he was not Peterson's immediate supervisor; instead, there was a third-shift supervisor and Murray was the supervisor of all the supervisors and guards. *Id.* at p. 12. Murray denied ever telling Peterson that she was fired, and he said that he did not have authority to terminate someone for a violation of a policy. *Id.* at p. 12-13. Instead, if someone had an infraction, Murray would write it up and submit

the matter to the HR department. The department would then make a decision. *Id.* at p. 13. Murray also denied that he called Peterson and used profanity. *Id.*

**{¶ 29}** Murray testified that he had written up Peterson for infractions in the past. *Id.* However, he did not recall speaking with Peterson when she called off due to a problem with her water heater. *Id.* at p. 14.

### E. Todd Harper Testimony

**{¶ 30}** Harper, the district manager, testified that Peterson had been relieved of duty because she was a no-call, no-show for three days in a row. *Id.* at p. 15-16. Harper also denied having a conversation with Peterson about her discharge and said that he never told Peterson over the phone that she was discharged. Harper further denied being belligerent or using profanity with Peterson during a phone call in mid-to-late December 2019. *Id.* at p. 16-17.

**{¶ 31}** Concerning the discharge, Harper testified that someone at the P&G site informed him that Peterson did not show up for work. He could not recall if he was told this by the shift supervisor or by the site supervisor, but he would have received the write-up that was generated. If three no-calls, no-shows occurred, he would submit the documentation to HR, and at that point, his hands would be off the situation completely. *Id.* at p. 17. As to who made the schedule at the P&G site, Harper said that the schedule was actually a standard schedule. When an employee was assigned to a site, the schedule was already made. For example, the post in question may be Monday through Friday, 8:00 to 4:00; Securitas hires the officer for that particular post, and the existing schedule becomes what the officer follows. *Id.* at p. 18.

### F. Tina Jackson Testimony on Recall

**{¶ 32}** Finally, Jackson was recalled and testified that if an employee felt he or she was being mistreated or that a manger or supervisor had used profanity, Securitas had an open door policy. *Id.* at p. 19. Specifically, any employee could reach out to HR, through email or phone, and set up a meeting to discuss the issues and handle them appropriately. *Id.* at p. 20. Jackson also testified that the termination process in general "is that if there's an issue at the site there are counseling forms that are presented to the officer." *Id.* When a copy of the counseling form came to the HR office, Jackson reviewed the form, made sure everything was correct, and ensured that the documents were maintained. If an employee received a final counseling form, if the infraction were repeated, the employee was referred to the HR office. *Id.*

**{¶ 33}** After hearing the evidence, the hearing officer issued a decision on April 24, 2020, finding that Peterson had been discharged for just cause. The hearing officer therefore reversed the Director's determination and required Peterson to repay the benefits she had been paid. Peterson filed a request for review, which the UCRC allowed. On June 10, 2020, the UCRC indicated that it would issue a decision based solely on the record, without further hearing. The UCRC then affirmed the hearing officer's decision on July 22, 2020.

**{¶ 34}** Peterson appealed to the trial court from the UCRC decision, and the court concluded that the decision was not unreasonable or unlawful and was not against the manifest weight of the evidence. Peterson's appeal to our court followed.

## II.   Whether Peterson Was Discharged for Just Cause

{¶ 35} As noted, Peterson is representing herself on appeal.   She has asserted three "issues" but has failed to follow the proper format for briefs as outlined in App.R. 16(A)(1)-(8) and (D).   Peterson's brief also consists of one paragraph of argument, without citation to the record or to any authorities.   Based on these omissions, we could "either strike the offending portions of the brief or sua sponte dismiss the appeal." *Brazelton v. Brazelton*, 2d Dist. Montgomery No. 24837, 2012-Ohio-3593, ¶ 8.   However, in the interests of justice, we will review the merits of Peterson's claims.   The three issues stated are as follows (quoted verbatim):

Ms. Peterson was Terminated on two different occasions December 16, 2019, by Mitch Murray and also by Todd Harper on phone.   Ms. Peterson also received the letter the following two weeks Via mail they also received a statement from the Unemployment office stating that Ms. Peterson filed for Unemployment.   Also, Securitas' Handbook-protocol regarding attendance was presented in Ms. Peterson's exhibit brief.

Ms. Peterson had contact with the employer Tina Jackson with emails and voice messages.   Also, Ms. Peterson's Daughter was in the room when the termination occurred instead of her sister and also in the TRANSCRIPT OF ADMINISTRATIVE AGENCY-ODJFS that was on file on August 17, 2020.

Ms. Peterson filed a motion to the Ohio Unemployment Compensation Review with all the details explaining what occurred and the text messages and voice mail that in file in May 2020 also in the transcripts

that were presented to the compensation review commission and unemployment.

{¶ 36} As indicated, because these contentions are essentially indecipherable, we will use the assignment of error that ODJFS proposed, which states that the issue is "whether the trial court erred when it affirmed the decision of the Review Commission finding that the Appellant was discharged for just cause." ODJFS Brief, p. 3 (Underlining and capital letters omitted.)

{¶ 37} By statute, unemployment compensation may not be paid if an applicant "quit work without just cause or has been discharged for just cause in connection with the individual's work." R.C. 4141.29(D)(1)(b)(2)(a). In these types of cases, the standard of review is well-established. "An appellate court may reverse the Unemployment Compensation Board of Review's 'just cause' determination only if it is unlawful, unreasonable or against the manifest weight of the evidence." *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 653 N.E.2d 1207 (1995), paragraph one of the syllabus.

{¶ 38} " 'Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Irvine v. State Unemp. Comp. Bd. of Rev.*, 19 Ohio St.3d 15, 17, 482 N.E.2d 587 (1985), quoting *Peyton v. Sun T.V.*, 44 Ohio App.2d 10, 12, 335 N.E.2d 751 (10th Dist.1975). While the Unemployment Compensation Act is intended to protect " 'unfortunate employees, who become and remain *involuntarily* unemployed,* * * [t]he Act does not exist to protect employees from themselves, but to protect them from economic forces over which they have no control. When an employee is at fault, he is no longer the victim

of fortune's whims, but is instead directly responsible for his own predicament. Fault on the employee's part separates him from the Act's intent and the Act's protection. Thus, fault is essential to the unique chemistry of a just cause termination.' " *Williams v. Ohio Dept. of Job & Family Servs.*, 129 Ohio St.3d 332, 2011-Ohio-2897, 951 N.E.2d 1031, ¶ 23, quoting *Tzangas* at 697-698.

{¶ 39} Notably, appellate courts have limited review powers and cannot make factual findings or decide witness credibility. *Tzangas* at 696. Instead, our duty "is to determine whether the decision of the board is supported by the evidence in the record." *Id.*, citing *Irvine v. Unemp. Comp. Bd. of Rev.*, 19 Ohio St.3d 15, 17-18, 492 N.E.2d 587 (1985). Furthermore, "[t]he fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision." *Id.*, citing *Irvine* at 18.

{¶ 40} After reviewing the record, we agree with the trial court that the UCRC decision should be affirmed. As a preliminary point, we note that the hearing officer specifically found the testimony of Securitas's witnesses (Murray and Harper) "more credible than the testimony presented by the claimant." Ex. B (April 24, 2020 Decision, p. 4). We are bound to accept the hearing officer's credibility decisions. Both these witnesses testified that they did not fire Peterson and did not have authority to fire her. Instead, that decision was made by the HR department, after Peterson failed to call or to show up for work.

{¶ 41} Furthermore, the evidence in the record contradicts Peterson's assertion that she was fired. If Peterson had been fired as she claims, there would have been no reason for her to call off work on December 17 or 18, and there would have been no reason for her to subsequently submit an incident report or her urgent care medical

information to the human resources department. In addition, if Peterson had been fired, she would surely have said so when she described her interactions with Murray and Harper in the incident letter submitted to the HR department on December 20, 2019 – four days after she was allegedly fired. Instead, she made no mention of this fact.

{¶ 42} In her brief, Peterson states that her daughter was in the room when the termination occurred. However, as the hearing officer noted, Peterson's daughter was unable to identify the date of the alleged conversation and failed to provide the name of the person or "any other details other than that the speaker was male and was rude to her mother." Ex. B (April 24, 2020 Decision, at p. 5). Again, competent credible evidence supported the decision.

{¶ 43} Peterson also mentions that she filed a motion with the UCRC "with all the details explaining what occurred and the text messages and voice mail that was file [sic] in May 2020." Appellant's Brief, p. 1. Presumably, Peterson is referring to her request for review of the hearing officer's decision, which was dated May 12, 2020. Ex. B (May 12, 2020 Request for Review). However, this three-page request did not refer to any text messages or voice mail.

{¶ 44} Significantly, the written instructions that the UCRC gave to both parties after the file was transferred from the Director – and in advance of the hearing – clearly stated that:

> **The file transferred to the Commission contains documents and written materials submitted by both parties up to the date the appeal was transferred to the Commission**. If you have any documents or written materials not previously submitted that you want the hearing officer

to consider, copies of these documents * * * **MUST BE SENT TO THE COMMISSION AND TO ALL PARTIES AND THEIR REPRESENTATIVES** * * *.

(Emphasis sic.)   Ex. B (March 20, 2020 Notice That an Appeal Has been Transferred by the Director to the Commission, p. 3).

{¶ 45} Peterson did not file any additional documents with the UCRC, despite having specifically been instructed to do so.   If voice mails or text messages existed or if phone records were relevant, Peterson could have filed those materials with the UCRC. Notably, Peterson was represented by counsel at the time.

{¶ 46} In appealing to the trial court, Peterson did attach various materials to her notice of administrative appeal, including a few text messages and some phone records. *See* Notice of Administrative Appeal (July 27, 2020).   However, R.C. 4141.282(H) specifically states that "[t]he court shall hear the appeal on the certified record provided by the commission."   Consequently, the trial court was limited to the record before the UCRC and could not consider additional materials. *E.g.*, *Puterbaugh v. Goodwill Industries of the Miami Valley, Inc.*, 2d Dist. Miami No. 2013-CA-39, 2014-Ohio-2208, ¶ 31 (holding that in light of R.C. 4141.282(H), "[t]he trial court did not have the authority to accept additional evidence").

{¶ 47} Finally, to the extent Peterson claims Securitas was required to contact her or inform her of her "schedule," that assertion was contradicted by the evidence. Employees assigned to a post have a set schedule that exists before they are assigned to the post.   Peterson presented no evidence otherwise.   The statement in the handbook was also clear and allowed Securitas to conclude that an employee had

resigned if the employee failed to call or show up three days or more in a row.

**{¶ 48}** Accordingly, the trial court did not err in affirming the UCRC's decision that Peterson was discharged for just case.   Peterson's three issues or assignments of error, therefore, are overruled.

## III.   Conclusion

**{¶ 49}** All of Peterson's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Michelle Peterson
Robin Jarvis
Hon. Susan D. Solle